680 S.E.2d 791

**George M. PETERS, Plaintiff Below, Appellee,**

v.

**RIVERS EDGE MINING, INC., a Delaware Corporation, Defendant Below, Appellant.**

No. 34272.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 24, 2009.

Modified Opinion Filed June 4, 2009.

Bryan R. Cokeley, J.A. Curia, III, Steptoe & Johnson, PLLC, Charleston, WV, C. David Morrison, Amy M. Smith, Steptoe & Johnson, PLLC, Clarksburg, WV for the Appellant.

Mark A. Atkinson, Paul L. Frampton, Jr., Atkinson & Polak, PLLC, Charleston, WV, Harry M. Hatfield, Hatfield & Hatfield, Madison, WV, for the Appellee.

DAVIS, Justice:

The appellant herein and defendant below, Rivers Edge Mining, Inc. (hereinafter referred to as "Rivers Edge"), appeals from an order entered October 17, 2007, by the Circuit Court of Boone County. By that order, the circuit court denied Rivers Edge's motions for judgment as a matter of law, for a new trial, or to alter or amend judgment and upheld the $1,855,107 jury verdict rendered in favor of the appellee herein and plaintiff below, George M. Peters (hereinafter referred to as "Mr. Peters"). On appeal to this Court, Rivers Edge assigns error to the circuit court's rulings (1) determining that Mr. Peters's claims under W. Va.Code § 23–5A–1 (1978) (Repl. Vol. 2005) and W. Va.Code § 23–5A–3(b) (1990) (Repl. Vol. 2005) were not preempted; (2) concluding that collateral estoppel did not bar Mr. Peters's claims; (3) permitting the jury to award Mr. Peters damages for front pay; and (4) upholding the jury's award of punitive damages. Upon a review of the parties' arguments, the record presented for appellate consideration, and the pertinent authorities, we affirm the decision of the Boone County Circuit Court.

# I.

## FACTUAL AND PROCEDURAL HISTORY

The events giving rise to the instant appeal began on October 28, 2003, when Mr. Peters, who was employed by Rivers Edge as a coal miner,[1] injured his wrist while hanging cable underground. Mr. Peters reported his injury to his section foreman when it occurred, but continued working until the end of his shift[2] because he believed he had only sprained his wrist. Following the completion of this work shift, Mr. Peters was scheduled to be off work for several days. When the pain in his wrist did not subside, he presented to Putnam General Hospital on November 1, 2003, where physicians determined that Mr. Peters had broken his wrist when he was injured on October 28th and placed his wrist in a cast. In conjunction with the medical treatment he received for his wrist injury, Mr. Peters filed a workers' compensation claim.

On his next scheduled workday, November 5, 2003, Mr. Peters, while still wearing the cast, reported to work. Because his wrist injury prevented Mr. Peters from performing his regular job duties but did not preclude him from working altogether, Rivers Edge placed him in its Transitional Work Program and assigned him the position of coal hauler. Mr. Peters's cast was removed in January 2004, and was replaced with a brace. Mr. Peters continued working as a coal hauler for Rivers Edge, while wearing a cast or a brace on his wrist, until March 1, 2004, on which date his doctor recommended he stop working because his wrist was not healing properly. While Mr. Peters was off from work, he requested and received workers' compensation temporary total disability benefits.

Mr. Peters's treating physician released him to return to work on May 7, 2004.

---

1. Mr. Peters began work with Rivers Edge on November 2, 2002, and was classified by Rivers Edge as a "temporary employee." In the written arbitration decision issued October 19, 2004, the arbitrator explains Mr. Peters's role as a temporary employee:

 As a Temporary Employee, the Grievant [Mr. Peters] was assigned to "B" crew and filled in for the absent permanent employees. The "B" crew worked the 4:00 pm to 2:00 am shift four (4) days per week. Employees know the days their crew is scheduled to work six (6) months in advance.

2. Mr. Peters worked the evening shift, which starts at 4:00 p.m. and ends at 2:00 a.m. the following day.

During the preceding week, Mr. Peters communicated several times with his workers' compensation case manager, Jo Clendenin (hereinafter referred to as "Ms. Clendenin") regarding the possibility of his return to work at Rivers Edge and his placement in its Transitional Work Program. On Monday, May 10, 2004, Ms. Clendenin received an e-mail from Donnie Pauley (hereinafter referred to as "Mr. Pauley"), the Transitional Work Program manager for Rivers Edge, indicating that Rivers Edge could accommodate Mr. Peters and stating that he would contact Mr. Peters. Shortly thereafter, Mr. Peters spoke with Ms. Clendenin. Ms. Clendenin recalls that she informed Mr. Peters that Rivers Edge could accommodate his employment restrictions and that Mr. Pauley would be calling him; Mr. Peters recalls that Ms. Clendenin informed him about his appointment for a functional capacity evaluation that was scheduled for later that same day.

Mr. Pauley then called the contact number Mr. Peters had listed in his personnel information, which was the phone number for Mr. Peters's mother's house, with whom Mr. Peters did not live.[3] When Mr. Peters was not available to take his call, Mr. Pauley left a message with Mr. Peters's mother to inform Mr. Peters that he had been approved to return to work. Mr. Pauley left two additional messages with Mr. Peters's mother on May 10th. Mr. Peters returned to his Boone County residence in the evening hours of Tuesday, May 11, 2004. Upon calling his mother, he learned that a representative of Rivers Edge had called to let him know he could return to work. By the time he received this message, his regular work shift had already started and been working for several hours.

On the morning of Wednesday, May 12, 2004, Mr. Peters called Mr. Pauley. Mr. Pauley informed Mr. Peters that he could return to work at Rivers Edge and would be placed in the Transitional Work Program. Mr. Peters stated that he would return to work on Thursday, May 13, 2004. Later that morning, Mr. Pauley telephoned Mr. Peters two more times. The parties dispute the content of these subsequent conversations. Mr. Pauley recalls that he informed Mr. Peters that he needed to report to work that day, i.e., May 12th, or he would be in violation of the "two-day rule" of the collective bargaining agreement.[4] Mr. Peters recalls that Mr. Pauley indicated that he would be permitted to return to work the following day, i.e., May 13th.

Mr. Peters did not report for work on May 12, 2004. He did, however, report for work on May 13, 2004, in time for his regular shift. When Mr. Peters arrived at work on May 13th, however, Rivers Edge suspended him for having had more than two consecutive unexcused absences. Rivers Edge ultimately terminated Mr. Peters's employment on May 18, 2004. Thereafter, Mr. Peters's union, the United Mine Workers of America, District 17, Local Union No. 781, filed a grievance on his behalf to challenge the propriety of his discharge. This grievance was arbitrated, and the arbitrator, by written opinion issued October 19, 2004, concluded that Rivers Edge had demonstrated "just cause" for terminating Mr. Peters's employment.

Mr. Peters then filed the underlying civil action in the Circuit Court of Boone County on January 25, 2006, alleging that his termination by Rivers Edge "constitute[d] an unlawful retaliatory discharge" in violation of W. Va.Code § 23–5A–1 [5] (1978) (Repl. Vol. 2005) and that Rivers Edge had "refused to

---

3. At the time of the events at issue herein, Mr. Peters had his own house in Boone County and did not live in his mother's home.

4. There existed at the Rivers Edge Mine a collective bargaining agreement between the mine and the mine-employees' labor union, i.e., United Mine Workers of America, which governed employment conditions at said mine and defined the rights and responsibilities of both the employer and the employees. See National Bituminous Coal Wage Agreement of 1998. The "two-day rule" refers to article XXII, § 4 of the collective

bargaining agreement which provides "[w]hen any Employee absents himself from work for a period of two consecutive days without the consent of the employer, other than for proven sickness, he may be discharged[.]"

5. W. Va.Code § 23–5A–1 (1978) (Repl. Vol. 2005) prohibits employers from retaliating against employees who have applied for and/or received workers' compensation benefits: "No employer shall discriminate in any manner against any of his present or former employees because of such

reinstate [him] to his employment" as required by W. Va.Code § 23–5A–3(b) [6] (1990) (Repl. Vol. 2005).[7] Thereafter, on November 13, 2006, Rivers Edge moved for summary judgment, arguing that Mr. Peters's claims are preempted by § 301 of the Labor Management Relations Act [8] because resolution of such claims requires interpretation of the governing collective bargaining agreement.[9]

The circuit court denied Rivers Edge's motion by order entered January 31, 2007.

Following trial of the case, a jury returned a verdict in favor of Mr. Peters on March 26, 2007. Specifically, the jury answered affirmatively the following questions on its verdict form:

1. Do you find that Plaintiff George Peters'[s] pursuit or receipt of workers'

---

present or former employee's receipt of or attempt to receive benefits under this chapter."

6. W. Va.Code § 23–5A–3(b) (1990) (Repl. Vol. 2005) directs that

[i]t shall be a discriminatory practice within the meaning of section one of this article for an employer to fail to reinstate an employee who has sustained a compensable injury to the employee's former position of employment upon demand for such reinstatement provided that the position is available and the employee is not disabled from performing the duties of such position. If the former position is not available, the employee shall be reinstated to another comparable position which is available and which the employee is capable of performing. A comparable position for the purposes of this section shall mean a position which is comparable as to wages, working conditions and, to the extent reasonably practicable, duties to the position held at the time of injury. A written statement from a duly licensed physician that the physician approves the injured employee's return to his or her regular employment shall be prima facie evidence that the worker is able to perform such duties. In the event that neither the former position nor a comparable position is available, the employee shall have a right to preferential recall to any job which the injured employee is capable of performing which becomes open after the injured employee notifies the employer that he or she desired reinstatement. Said right of preferential recall shall be in effect for one year from the day the injured employee notifies the employer that he or she desires reinstatement: Provided, That the employee provides to the employer a current mailing address during this one year period.

7. Mr. Peters also averred that Rivers Edge violated W. Va.Code § 23–5A–3(a) (1990) (Repl. Vol. 2005) because it unlawfully terminated his employment while he was off work and receiving workers' compensation benefits. See W. Va. Code § 23–5A–3(a) (1990) (Repl. Vol. 2005) ("It shall be a discriminatory practice within the meaning of section one [§ 23–5A–1] of this article to terminate an injured employee while the injured employee is off work due to a compensable injury within the meaning of article four [§§ 23–4–1 et seq.] of this chapter and is receiving or is eligible to receive temporary total disability benefits, unless the injured employee has

committed a separate dischargeable offense. A separate dischargeable offense shall mean misconduct by the injured employee wholly unrelated to the injury or the absence from work resulting from the injury. A separate dischargeable offense shall not include absence resulting from the injury or from the inclusion or aggregation of absence due to the injury with any other absence from work."). Additionally, Mr. Peters alleged that Rivers Edge had discriminated against him on the basis of age and disability, see W. Va.Code § 5–11–9(1) (1998) (Repl. Vol. 2006), and that his termination constituted an "unlawful retaliatory discharge" as contemplated by *Harless v. First National Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978) (*Harless I*). However, Mr. Peters abandoned these additional theories and proceeded to trial solely upon his claims under W. Va.Code §§ 23–5A–1 and 23–5A–3(b), alleging retaliatory discharge based upon his receipt of workers' compensation benefits.

8. Section 301 of the Labor Management Relations Act is codified at 29 U.S.C. § 185 and affords federal courts jurisdiction over cases involving the interpretation of a collective bargaining agreement. See 29 U.S.C. § 185(a) (1947) ("Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."). For further treatment of the preemption issue, see Section III.A, *infra*.

9. See *Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 220, 105 S.Ct. 1904, 1916, 85 L.Ed.2d 206 (1985) ("[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between parties in a labor contract, that claim must either be treated as a § 301 claim ... or dismissed as pre-empted by federal labor-contract law." (citation omitted)); *Textile Workers Union of America v. Lincoln Mills of Alabama*, 353 U.S. 448, 456, 77 S.Ct. 912, 918, 1 L.Ed.2d 972 (1957) ("[T]he substantive law to apply in suits under § 301(a) is federal law, which the courts must fashion from the policy of our national labor laws." (citation omitted)).

compensation benefits was a substantial or motivating factor in his discharge from employment?

 ✓ Yes No

2. Do you find that the defendant [Rivers Edge] unlawfully failed to reinstate George Peters to his former position?

 ✓ Yes No

The jury then responded in the negative to the inquiry asking,

3. Do you find that Rivers Edge Mining Inc., has proven it would have discharged Mr. Peters, notwithstanding his pursuit or receipt of workers' compensation benefits?

 Yes ✓ No

Having made these findings, the jury awarded Mr. Peters a total of $885,107 in compensatory damages. Specifically, the jury awarded compensatory damages of $171,697 for back pay; $513,410 for front pay; and $200,000 for aggravation, inconvenience, humiliation, embarrassment and loss of dignity. The jury further found that Mr. Peters was entitled to an award of punitive damages of $1,000,000.

Rivers Edge then requested the circuit court to review the propriety and amount of the punitive damages awarded by the jury. By order entered June 29, 2007, the circuit court denied Rivers Edge's requested relief and upheld the jury's punitive damages award. The circuit court then entered judgment in favor of Mr. Peters by judgment order entered August 2, 2007.[10] On August 15, 2007, Rivers Edge moved for judgment as a matter of law, for a new trial, or to alter or amend the judgment. The circuit court denied all three motions by order entered October 17, 2007. From these adverse rulings, Rivers Edge now appeals to this Court.

## II.

## STANDARD OF REVIEW

In the instant proceeding, Rivers Edge appeals from the circuit court's order deny-

ing its motion for judgment as a matter of law, its motion for a new trial, and its motion to alter or amend the judgment.

■ Rivers Edge first assigns error to the circuit court's denial of its motion for judgment as a matter of law. In Syllabus point 1 of *Fredeking v. Tyler*, 224 W.Va. 1, 680 S.E.2d 16 (2009), we recently have held that "[t]he appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998] is *de novo*." *Id.* Moreover,

> [w]hen this Court reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented. Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party.

Syl. pt. 2, *Fredeking v. Tyler*, 224 W.Va. 1, 680 S.E.2d 16.

■ Rivers Edge also appeals from the circuit court's ruling denying its motion for a new trial. When reviewing a circuit court's decision on such a motion, we have held that

> "[t]he ruling of a trial court in granting or denying a motion for a new trial is entitled to great respect and weight, [and] the trial court's ruling will be reversed on appeal [only] when it is clear that the trial court has acted under some misapprehension of the law or the evidence." Syl. pt. 4, in part, *Sanders v. Georgia–Pacific Corp.*, 159 W.Va. 621, 225 S.E.2d 218 (1976).

10. In its judgment order, the circuit court awarded Mr. Peters an additional $49,259 for prejudgment interest on his back pay award in accordance with W. Va.Code § 56–6–31 (2006) (Supp.

2008) and *Rodriguez v. Consolidation Coal Co.*, 206 W.Va. 317, 524 S.E.2d 672 (1999) (per curiam).

Syl. pt. 2, *Estep v. Mike Ferrell Ford Lincoln–Mercury, Inc.*, 223 W.Va. 209, 672 S.E.2d 345 (2008). *Accord Tennant v. Marion Health Care Found., Inc.*, 194 W.Va. 97, 104, 459 S.E.2d 374, 381 (1995) ("We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review."). *See also State v. Crouch*, 191 W.Va. 272, 275, 445 S.E.2d 213, 216 (1994) ("The question of whether a new trial should be granted is within the sound discretion of the trial court and is reviewable only in the case of abuse."). Furthermore,

[i]n determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Syl. pt. 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983).

▬▬▬ Lastly, Rivers Edge challenges the circuit court's decision denying its motion to alter or amend the judgment.

The standard of review applicable to an appeal from a motion to alter or amend a judgment, made pursuant to W. Va. R. Civ. P. 59(e), is the same standard that would apply to the underlying judgment upon which the motion is based and from which the appeal to this Court is filed.

Syl. pt. 1, *Wickland v. American Travellers Life Ins. Co.*, 204 W.Va. 430, 513 S.E.2d 657 (1998). Thus, to the extent that Rivers Edge assigns error to the circuit court's determination of questions of law involved in this case, our review of those assignments of error is *de novo:* "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.*, 194 W.Va. 138, 459 S.E.2d 415 (1995). *Accord* Syl. pt. 1, *Appalachian Power Co. v. State Tax Dep't of West Virginia*, 195 W.Va. 573, 466 S.E.2d 424 (1995) ("Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review."). Where, however, Rivers Edge's argument pertains to the circuit court's rulings in the underlying trial, generally, we employ a multifaceted review:

In reviewing challenges to the findings and conclusions of the circuit court, we apply a two-prong deferential standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to *de novo* review.

Syl. pt. 2, *Walker v. West Virginia Ethics Comm'n*, 201 W.Va. 108, 492 S.E.2d 167 (1997). *Accord* Syl. pt. 4, *Burgess v. Porterfield*, 196 W.Va. 178, 469 S.E.2d 114 (1996) ("This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo*."). *See also* Syl. pt. 3, *State v. Vance*, 207 W.Va. 640, 535 S.E.2d 484 (2000) ("In reviewing challenges to findings and rulings made by a circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.").

Mindful of these standards,[11] we proceed to consider the parties' arguments.

---

11. In addition to the above-quoted standards of review, additional standards of review specific to the issues raised by the parties will be discussed in connection with our discussion and decision of those issues in Section III, *infra*.

## III.

## DISCUSSION

On appeal to this Court, Rivers Edge assigns four errors to the circuit court's rulings (1) determining that Mr. Peters's claims under W. Va.Code § 23–5A–1 (1978) (Repl. Vol. 2005) and W. Va.Code § 23–5A–3(b) (1990) (Repl. Vol. 2005) were not preempted; (2) concluding that collateral estoppel did not bar Mr. Peters's claims; (3) permitting the jury to award Mr. Peters damages for front pay; and (4) upholding the jury's award of punitive damages. We will address each of these errors in turn.

### A. Preemption

▮ Rivers Edge first argues that the circuit court erred by ruling that Mr. Peters's claims were not preempted by federal law. First, Rivers Edge represents that the United States Supreme Court has held that causes of action whose resolution require the interpretation of a collective bargaining agreement are to be determined under federal law. *See generally Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 105 S.Ct. 1904, 85 L.Ed.2d 206 (1985). However, this Court, in *Yoho v. Triangle PWC, Inc.*, 175 W.Va. 556, 336 S.E.2d 204 (1985), has held that claims alleging workers' compensation discrimination under W. Va.Code § 23–5A–1 are not preempted because such claims do not require the interpretation of a collective bargaining agreement for their resolution. *See* Syl. pt. 2, *Yoho*, 175 W.Va. 556, 336 S.E.2d 204 ("An action for wrongful termination under W. Va.Code § 23–5A–1 (1981) is not preempted by federal labor law.").

Nevertheless, Rivers Edge urges this Court to reexamine our holding in *Yoho* in light of after-decided United States Supreme Court precedent requiring determination of the preemption issue on a case-by-case basis to consider whether resolution of a plaintiff's claims in a particular case requires interpretation of the collective bargaining agreement. *See Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988). Under the facts of this case, Rivers Edge argues that Mr. Peters's claims are preempted because its assertion of a nonpre-

textual reason for discharging Mr. Peters, *i.e.*, his violation of the "two-day rule," requires interpretation of the collective bargaining agreement governing the parties' employment relationship.

By contrast, Mr. Peters urges this Court to apply our holding in *Yoho* to find that his claims of workers' compensation discrimination are not preempted. Alternatively, Mr. Peters disputes Rivers Edge's characterization of the case as requiring interpretation of the collective bargaining agreement to resolve his claims of workers' compensation discrimination. Rather, Mr. Peters states that resolution of his workers' compensation discrimination claims simply requires proof of a *prima facie* case as required by *Powell v. Wyoming Cablevision, Inc.*, 184 W.Va. 700, 403 S.E.2d 717 (1991). In support of his position, Mr. Peters asserts that the collective bargaining agreement does not need to be interpreted to prove that (1) he sustained an "on-the-job injury"; (2) he instituted "proceedings ... under the Workers' Compensation Act, W. Va.Code, 23–1–1, *et seq.*"; and (3) his "filing of a workers' compensation claim was a significant factor in [Rivers Edge's] decision to discharge" him. Syl. pt. 1, in part, *Powell*, 184 W.Va. 700, 403 S.E.2d 717.

The circuit court ruled upon this issue in deciding Rivers Edge's motion for summary judgment based upon its arguments that Mr. Peters's claims were preempted. By order entered January 31, 2007, the circuit court denied Rivers Edge's motion. During the November 27, 2006, hearing thereon, the circuit court explained its reasoning, stating that

> I'm going to deny your motion ... I do not think that we're going to be asking the jury to interpret the contract as this—all of this preemption law is about, and I think that we're just going to be asking them to settle factual matters.... [Y]our [Rivers Edge's] motion is denied. It's not preempted.

The circuit court correctly decided this issue, and we agree with the circuit court's conclusion: Mr. Peters's claims of workers' compensation discrimination are not preempted by federal law.

At the outset, we note that "'[p]reemption is a question of law reviewed *de novo.*' *Hartley Marine Corp. v. Mierke,* 196 W.Va. 669, 673, 474 S.E.2d 599, 603 (1996), citing *Kollar v. United Transportation Union,* 83 F.3d 124, 125 (5th Cir.1996)." Syl. pt. 2, *Lontz v. Tharp,* 220 W.Va. 282, 647 S.E.2d 718 (2007) (per curiam). With respect to the case *sub judice,* we previously have considered and decided the issue of whether claims alleging workers' compensation discrimination are preempted by federal law. In Syllabus point 2 of *Yoho v. Triangle PWC, Inc.,* 175 W.Va. 556, 336 S.E.2d 204 (1985), we succinctly held that "[a]n action for wrongful termination under W. Va.Code § 23–5A–1 (1981) is not pre-empted by federal labor law." This case remains good law and is determinative of our resolution of the issues presented by this assignment of error.[12]

In his complaint, Mr. Peters alleged, in his "First Cause of Action," that "[t]he defendants' [Eastern Associated Coal, LLC; Rivers Edge Mining, Inc.; Bennie Milam; and Peabody Holding Company, Inc.] actions constitute an unlawful retaliatory discharge motivated, in whole or in part, by the plaintiff's [Mr. Peters's] attempt to receive benefits from the Workers' Compensation Division of the West Virginia Bureau of Employment Programs, in violation of § 23–5A–1 of the West Virginia Code, as amended." Thus, Mr. Peters has brought an "action for wrongful termination under W. Va.Code § 23–5A–1." Syl. pt. 2, in part, *Yoho,* 175 W.Va. 556, 336 S.E.2d 204. Based upon our clear holding in Syllabus point 2 of *Yoho,* we conclude that Mr. Peters's claim alleging workers' compensation discrimination under W. Va. Code § 23–5A–1 is not preempted. Accordingly, we affirm the circuit court's ruling similarly finding that Mr. Peters's workers' compensation discrimination claim is not preempted.

Our inquiry does not end here, however, because Mr. Peters also alleged in his complaint that his termination by Rivers Edge additionally violated W. Va.Code § 23–5A–3. In his "Second Cause of Action," Mr. Peters asserted that "[t]he defendants refused to reinstate the plaintiff to his employment, as required by West Virginia Code § 23–5A–3(b)."[13] Our holding in *Yoho,* however, only addresses actions brought under W. Va.Code § 23–5A–1. The Legislature did not enact W. Va.Code § 23–5A–3 until 1990, which was five years *after* we decided *Yoho.* Thus, we did not have occasion to consider the preemption issue vis-a-vis W. Va.Code § 23–5A–3 in *Yoho.*

Nevertheless, it is apparent from the face of the subject statutes that both W. Va.Code

**12.** While we appreciate Rivers Edge's recognition of precedent decided by the United States Supreme Court after we issued our opinion in *Yoho v. Triangle PWC, Inc.,* 175 W.Va. 556, 336 S.E.2d 204 (1985), which precedent requires preemption issues to be decided on a case-by-case basis, we note that none of the authority cited by Rivers Edge overrules our decision in *Yoho.*

Moreover, *Lingle v. Norge Division of Magic Chef, Inc.,* 486 U.S. 399, 108 S.Ct. 1877, 100 L.Ed.2d 410 (1988), is not as distinguishable from our holding in *Yoho* as Rivers Edge suggests. Although the Court in *Lingle* recognized that there may arise cases in which a state may grant workers a nonnegotiable right the resolution of which nevertheless requires interpretation of a collective bargaining agreement, *Lingle,* 486 U.S. at 408–10, 108 S.Ct. at 1883, 100 L.Ed.2d 410, the ultimate preemption inquiry remains whether application of state law "requires the interpretation of a collective-bargaining agreement." *Lingle,* 486 U.S. at 413, 108 S.Ct. at 1885, 100 L.Ed.2d 410. This is the same analysis we applied in reaching our decision in *Yoho. Yoho,* 175 W.Va. at 560, 336 S.E.2d at 208.

Finally, to the extent that Rivers Edge urges this Court to adopt a case-by-case approach to preemption issues, we have already done so in *Greenfield v. Schmidt Baking Co., Inc.,* 199 W.Va. 447, 485 S.E.2d 391 (1997). *See* Syl. pt. 4, *Greenfield v. Schmidt Baking Co., Inc.,* 199 W.Va. 447, 485 S.E.2d 391 (1997) ("An application of state law is pre-empted by § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (1947) (1994 ed.), only if such application requires the interpretation of a collective-bargaining agreement."); Syl. pt. 5, *Greenfield,* 199 W.Va. 447, 485 S.E.2d 391 ("A determination of pre-emption under § 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185 (1947) (1994 ed.), requires a fact specific analysis.").

**13.** In his "Third Cause of Action," Mr. Peters additionally alleged that "[t]he defendants terminated the plaintiff's employment in violation of West Virginia Code § 23–5A–3(a)." However, because Mr. Peters abandoned this claim before the trial of his case, it is not necessary for us to consider whether this claim is preempted. *See supra* note 8.

§ 23–5A–1 and W. Va.Code § 23–5A–3 afford injured workers protection from discrimination occasioned by their application for and/or receipt of workers' compensation benefits. Moreover, both of these sections are codified within Article 5A of the West Virginia Code pertaining to "Discriminatory Practices." Because both of these provisions are part of the same body of law, they should be construed and applied consistently with one another. *See* Syl. pt. 1, *State ex rel. Simpkins v. Harvey,* 172 W.Va. 312, 305 S.E.2d 268 (1983) (" 'A statute should be so read and applied as to make it accord with the spirit, purposes and objects of the general system of law of which it is intended to form a part; it being presumed that the legislators who drafted and passed it were familiar with all existing law, applicable to the subject matter, whether constitutional, statutory or common, and intended the statute to harmonize completely with the same and aid in the effectuation of the general purposes and design thereof, if its terms are consistent therewith.' Syllabus Point 5, *State v. Snyder,* 64 W.Va. 659, 63 S.E. 385 (1908)."), *superseded by statute on other grounds as stated in State ex rel. Hagg v. Spillers,* 181 W.Va. 387, 382 S.E.2d 581 (1989), *superseded by statute on other grounds as stated in State v. Yoak,* 202 W.Va. 331, 504 S.E.2d 158 (1998); Syl. pt. 3, *Smith v. State Workmen's Comp. Comm'r,* 159 W.Va. 108, 219 S.E.2d 361 (1975) ("Statutes which relate to the same subject matter should be read and applied together so that the Legislature's intention can be gathered from the whole of the enactments."); *State v. Epperly,* 135 W.Va. 877, 881, 65 S.E.2d 488, 491 (1951) ("[A]ll statutes which deal with the same subject, or which have the same general purpose, should be read in connection with it, as together constituting one law, even though such statutes were enacted at different times[.]" (citation omitted)).

In *Yoho,* we reiterated the holding of the United States Supreme Court determining that state law claims requiring the interpretation of a collective bargaining agreement are preempted by federal law: " '[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between parties in a labor contract, that claim must either be treated as a § 301 claim . . . or dismissed as pre-empted by federal labor-contract law.' " *Yoho,* 175 W.Va. at 559, 336 S.E.2d at 207 (quoting *Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 220, 105 S.Ct. 1904, 1916, 85 L.Ed.2d 206 (1985) (citation omitted)). However, we also considered the Supreme Court's recognition that

> not all labor disputes are pre-empted by Section 301:
>
> > Clearly § 301 does not grant the parties to a collective-bargaining agreement the ability to contract for what is illegal under state law. In extending the pre-emptive effect of § 301 beyond suits for breach of contract, it would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract.

*Yoho,* 175 W.Va. at 559, 336 S.E.2d at 207 (quoting *Allis–Chalmers,* 471 U.S. at 212, 105 S.Ct. at 1912, 85 L.Ed.2d 206 (footnote omitted)). Applying this reasoning to the cause of action at issue in *Yoho,* we determined that the claim asserted by the injured employee alleging a violation of W. Va.Code § 23–5A–1 was a "state law claim [which] is not dependent upon analysis of the terms of [the parties'] collective bargaining agreement and, therefore, falls into that category of cases which Congress did not intend to preempt." *Yoho,* 175 W.Va. at 560, 336 S.E.2d at 208.

▬▬ Reading and applying W. Va.Code § 23–5A–3 consistently with W. Va.Code § 23–5A–1, we conclude that the same reasoning should apply to the additional claim asserted by Mr. Peters in this case under W. Va.Code § 23–5A–3(b), which claim did not exist when we decided *Yoho.* To decide otherwise would produce inconsistent results in contravention of this Court's duty to "avoid whenever possible [an application] of a statute which leads to absurd, inconsistent, unjust or unreasonable results." *State v. Kerns,* 183 W.Va. 130, 135, 394 S.E.2d 532, 537 (1990). Accordingly, consistent with our holding in Syllabus point 2 of *Yoho,* we hold that an action for wrongful termination under W. Va.Code § 23–5A–3 (1990) (Repl. Vol.

2005) is not pre-empted by federal labor law. Because Mr. Peters's second cause of action alleged a claim for workers' compensation discrimination pursuant to W. Va.Code § 23–5A–3(b), the circuit court correctly found that Mr. Peters's claim was not preempted. Therefore, we affirm the circuit court's ruling.

### B. Collateral Estoppel

 Rivers Edge next argues that the circuit court erred by ruling that Mr. Peters was not collaterally estopped from relitigating, in circuit court, issues that it claims had already been resolved during the arbitration proceedings. Specifically, Rivers Edge contends that because the arbitrator resolved factual issues pertaining to whether Mr. Peters had violated the collective bargaining agreement's "two-day rule," such rulings constituted a final determination on the merits, and the circuit court should not have allowed such issues to be relitigated during the trial in this case.

Responding to Rivers Edge's arguments, Mr. Peters contends that the circuit court did not err as alleged by Rivers Edge because collateral estoppel forecloses the relitigation of *identical* issues that have been previously decided. *See* Syl. pt. 1, in part, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995). Because the issues decided in the arbitration proceeding, *i.e.*, whether he had violated the collective bargaining agreement, are not identical to the issues raised in the instant proceeding, *i.e.*, whether his discharge constituted an unlawful retaliatory discharge in violation of W. Va.Code § 23–5A–1 and W. Va.Code § 23–5A–3(b), the circuit court correctly ruled that he was not collaterally estopped from presenting factual issues surrounding his discharge to the jury for their deliberation and determination.

14. By contrast, *res judicata*, or claim preclusion, "is a doctrine which bars the subsequent litigation of any cause of action which has been previously tried on the merits by a court of competent jurisdiction, and includes within its bar issues which might have been tried." *Mellon–Stuart Co. v. Hall*, 178 W.Va. 291, 298, 359 S.E.2d 124, 131 (1987). *Accord State v. Miller*, 194 W.Va. 3, 9, 459 S.E.2d 114, 120 (1995) ("*Res judicata*

 At issue in this assignment of error is whether collateral estoppel operates to preclude Mr. Peters from litigating, in his state court trial, certain factual issues previously decided by an arbitrator during the grievance proceedings brought by his union on his behalf. Collateral estoppel, or issue preclusion, forecloses the relitigation of "issues that were actually litigated in an earlier suit even though the causes of action [in the former and subsequent proceedings] are different." [14] *Mellon–Stuart Co. v. Hall*, 178 W.Va. 291, 298–99, 359 S.E.2d 124, 131–32 (1987). *Accord State v. Miller*, 194 W.Va. 3, 9, 459 S.E.2d 114, 120 (1995) ("'[C]ollateral estoppel requires identical issues raised in successive proceedings and requires a determination of the issues by a valid judgment to which such determination was essential to the judgment." (footnote and citations omitted)); *Conley v. Spillers*, 171 W.Va. 584, 588, 301 S.E.2d 216, 220 (1983) ("Collateral estoppel is designed to foreclose relitigation of issues in a second suit which have actually been litigated in the earlier suit even though there may be a difference in the cause of action between the parties of the first and second suit."). *See generally* Franklin D. Cleckley, Robin J. Davis, & Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure* § 8(c)[xi][I] (3d ed. 2008). Stated otherwise, "[t]he central inquiry on collateral estoppel is whether a given issue has been actually litigated by the parties in the earlier suit." *Mellon–Stuart Co.*, 178 W.Va. at 299, 359 S.E.2d at 132. In this regard, we have held that

[c]ollateral estoppel is designed to foreclose litigation of issues in a second suit which have actually been litigated in the earlier suit even though there may be a difference in the cause of action between the parties of the first and second suit. We have made this summary of the doctrine of collateral estoppel:

generally applies when there is a final judgment on the merits which precludes the parties or their privies from relitigating the issues that were decided or the issues that could have been decided in the earlier action. . . . A claim is barred by *res judicata* when the prior action involves identical claims and the same parties or their privies." (citations omitted)).

"But where the causes of action are not the same, the parties being identical or in privity, the bar extends to only those matters which were actually litigated in the former proceeding, as distinguished from those matters that might or could have been litigated therein, and arises by way of estoppel rather than by way of strict *res adjudicata.*" *Lane v. Williams,* 150 W.Va. 96, 100, 144 S.E.2d 234, 236 (1965).[15]

Syl. pt. 2, *Conley v. Spillers,* 171 W.Va. 584, 301 S.E.2d 216 (footnote added). More specifically,

[c]ollateral estoppel will bar a claim if four conditions are met: (1) The issue previously decided is identical to the one presented in the action in question; (2) there is a final adjudication on the merits of the prior action; (3) the party against whom the doctrine is invoked was a party or in privity with a party to a prior action; and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.[16]

Syl. pt. 1, *State v. Miller,* 194 W.Va. 3, 459 S.E.2d 114 (footnote added). Whether the doctrine of collateral estoppel will be applied in a particular case, though, rests within the sound discretion of the trial court: "[t]he application of the doctrine of collateral estoppel is discretionary with the trial court[.]" Syl. pt. 7, in part, *Conley,* 171 W.Va. 584, 301 S.E.2d 216.

Our inquiry begins with the first factor of the *Miller* test: was "[t]he issue previously decided . . . identical to the one presented in the action in question[?]" Syl. pt. 1, in part, *Miller,* 194 W.Va. 3, 459 S.E.2d 114. We conclude that it was not. In the prior arbitration, Rivers Edge presented the issue of whether it was justified in terminating Mr. Peters based upon his violation of the "two-day rule." However, in the underlying circuit court litigation, Mr. Peters presented the issue of whether Rivers Edge's asserted reliance on his violation of the "two-day rule" was a pretext for the unlawful workers' compensation discrimination that actually formed the basis of Rivers Edge's decision to discharge him. Thus, it is clear that the two litigations involve different central issues: the arbitration sought to resolve, under the collective bargaining agreement, whether Rivers Edge terminated Mr. Peters because he had violated the "two-day rule" while the circuit court litigation sought to resolve, under our workers' compensation discrimination statutes, whether Rivers Edge's termination of Mr. Peters based upon his violation of the "two-day rule" was pretextual.[17] Be-

15. *Cf.* Syl. pt. 1, *In re Estate of McIntosh,* 144 W.Va. 583, 109 S.E.2d 153 (1959) (discussing doctrine of *res judicata*).

16. *Cf.* Syl. pt. 4, *Blake v. Charleston Area Med. Ctr., Inc.,* 201 W.Va. 469, 498 S.E.2d 41 (1997) (describing elements of *res judicata*).

17. Courts in other jurisdictions who have considered whether issues resolved in arbitration are identical to issues raised in subsequent civil litigation likewise have concluded that collateral estoppel does not bar an aggrieved employee from litigating such issues anew in civil proceedings alleging workers' compensation discrimination. *See, e.g., Truax v. EM Indus., Inc.,* 107 Ohio App.3d 210, 668 N.E.2d 524, 529 (1995) ("Collateral estoppel precludes relitigation only when the identical issue was actually decided in the former case. . . . [T]he issues decided in an arbitration and a statutory claim for retaliatory discharge are not the same."); *Carrozza v. Texas Div.-Tranter, Inc.,* 876 S.E.2d 173, 176 (Tex. App.) ("[E]ven when an arbitration decision [under a collective bargaining agreement] is adverse to an employee, he still has the right to bring a wrongful discharge action under [the Workers'

Compensation Act]." (citations omitted)), *rev'd on other grounds,* 876 S.W.2d 312 (Tex.1994) (per curiam). *See also Goodwin v. Board of Trs. of the Univ. of Illinois,* 442 F.3d 611, 621 (7th Cir.2006) (finding no collateral estoppel bar because issues determined by hearing examiner regarding circumstances surrounding employee's discharge were *"similar"* to issues raised in civil action alleging wrongful discharge but not *"identical"* thereto); *Blanchette v. School Comm. of Westwood,* 427 Mass. 176, 181, 692 N.E.2d 21, 25–26 (1998) (deciding that prior arbitration, under collective bargaining agreement, did not preclude aggrieved employee's subsequent civil litigation alleging retaliation in violation of statutory civil rights law); *Domingues v. City of San Antonio,* 985 S.W.2d 505 (Tex.App.1998) (concluding that collateral estoppel did not bar aggrieved employee from relitigating reason for employer's disciplinary decision in subsequent proceeding under state whistleblower law where arbitrator previously found that employee had engaged in misconduct warranting discipline). *But see Castillo v. City of Los Angeles,* 111 Cal. Rptr.2d 870, 875, 92 Cal.App.4th 477, 481 (2001) ("The issue, wrongfulness of the dis-

cause these issues are different, they are not identical as required by the first factor of *Miller. See* Syl. pt. 1, *Miller,* 194 W.Va. 3, 459 S.E.2d 114. Insofar as Rivers Edge has failed to satisfy the first factor of the *Miller* test, we need not address the remaining elements of this test given that the satisfaction of all four factors are required for an issue to be collaterally estopped. *See* Syl. pt. 1, *id.* Accordingly, the circuit court did not abuse its discretion in ruling that collateral estoppel did not operate to bar Mr. Peters from litigating issues surrounding Rivers Edge's termination of his employment during the trial of this matter, and we affirm the circuit court's ruling in this regard.

### C. Front Pay

For its third assignment of error, Rivers Edge argues that the circuit court erred by upholding the jury's award of $513,410 for front pay. In this regard, Rivers Edge argues that the workers' compensation discrimination statutes are silent as to whether front pay is an available remedy for the violation thereof. Because these statutes are a codification of the common law of retaliatory discharge, Rivers Edge suggests that only those common law remedies are available to an employee asserting a claim for workers' compensation discrimination. Since reinstatement was not a remedy for retaliatory discharge at common law, Rivers Edge contends that front pay, which is a substitute for reinstatement, is not an available remedy for workers' compensation discrimination. *Citing Harless v. First Nat'l Bank in Fairmont,* 169 W.Va. 673, 692, 289 S.E.2d 692, 703 (1982) (*Harless II*).

Moreover, Rivers Edge argues, although the West Virginia Human Rights Act specifically provides for the "reinstatement" of aggrieved employees, *see* W. Va.Code § 5–11–13(c) (1998) (Repl. Vol. 2006), the workers' compensation discrimination statutes make no such provision. It being presumed that the Legislature knew the law in existence at the time it enacted the workers' compensation discrimination statutes, Rivers Edge contends that front pay should not be read into the statutes as a remedy for such discharge, is identical in the administrative pro-

crimination when the Legislature made no such designation.

Lastly, Rivers Edge argues that even if front pay is an appropriate remedy in this case, the evidence is not sufficient to support the amount of front pay damages awarded to Mr. Peters. Rivers Edge contends that the amount of front pay damages found by the jury is speculative insofar as it extends too far into the future. In support of this argument, Rivers Edge represents that Mr. Peters was fifty-two years old at the time of the trial and failed to provide evidence of his efforts to mitigate his damages.

Mr. Peters responds that the circuit court did not err by upholding the jury's award of damages for front pay. Employing Rivers Edge's reasoning, Mr. Peters suggests that because the workers' compensation discrimination statutes are silent as to any remedies that are available for a violation thereof, he should not be entitled to recover any damages from Rivers Edge whatsoever. Mr. Peters contends that, taken to this illogical conclusion, Rivers Edge's argument is absurd. Rather, Mr. Peters represents that this Court has found a cause of action to exist for the violation of the workers' compensation discrimination statutes and has determined that such action sounds in tort. *Citing* Syl. pt. 2, *Shanholtz v. Monongahela Power Co.,* 165 W.Va. 305, 270 S.E.2d 178 (1980). Insofar as front pay is an available remedy in cases alleging the tort of retaliatory discharge in which reinstatement is not appropriate, *citing Dobson v. Eastern Associated Coal Corp.,* 188 W.Va. 17, 422 S.E.2d 494 (1992), Mr. Peters asserts that he is entitled to recover damages for front pay in this case.

With respect to Rivers Edge's objections to the amount of front pay awarded by the jury, Mr. Peters submits that the evidence adduced at trial supports the jury's award. First, Mr. Peters rejects Rivers Edge's arguments suggesting that he did not offer sufficient proof of his attempts to mitigate his damages because the burden is on the employer, not the wrongfully terminated employee, with respect to mitigation. *Citing*

ceeding and this suit.").

Syl. pt. 10, in part, *Maxey v. McDowell County Bd. of Educ.*, 212 W.Va. 668, 575 S.E.2d 278 (2002). Second, Mr. Peters contends that his expert's calculations were consistent with this Court's decision in *Andrews v. Reynolds Memorial Hospital, Inc.*, 201 W.Va. 624, 499 S.E.2d 846 (1997).

During the pretrial proceedings in this case, the circuit court determined that reinstatement would not be an appropriate remedy in this case and, thus, that the proper remedy in lieu of reinstatement would be front pay. *See Thompson v. Town of Alderson*, 215 W.Va. 578, 581, 600 S.E.2d 290, 293 (2004) ("[A] court may rule preliminarily, that reinstatement is not a remedy that will be considered by the court."). *See also Dobson v. Eastern Assoc. Coal Corp.*, 188 W.Va. 17, 24, 422 S.E.2d 494, 501 (1992) (recognizing front pay as substitute for reinstatement).

At issue in this assignment of error is whether Mr. Peters is entitled to an award of front pay and, if he is, whether the amount of front pay damages awarded by the jury is supported by the evidence. We will consider each of these issues.

**1. Front pay is an available remedy in workers' compensation discrimination cases.** In this case, Mr. Peters asserted claims against Rivers Edge alleging workers' compensation discrimination pursuant to W. Va.Code § 23–5A–1 and W. Va. Code § 23–5A–3(b). The statutes defining these prohibited discriminatory practices are silent as to the remedies that are available for the violation of these provisions. In *Shanholtz v. Monongahela Power Co.*, 165 W.Va. 305, 270 S.E.2d 178 (1980), we held that an aggrieved employee could maintain a cause of action for workers' compensation discrimination: "It is a contravention of public policy and actionable to discharge an employee because he has filed a workmen's compensation claim against his employer." Syl. pt. 2, *id.* We further found that such an action sounds in tort. 165 W.Va. at 310, 270 S.E.2d at 182. *Accord* Syl. pt. 4, in part, *Dobson v. Eastern Assoc. Coal Corp.*, 188 W.Va. 17, 422 S.E.2d 494 (1992) (holding that person who files civil action to enforce provisions of W. Va. Human Rights Act, W. Va.

Code § 5–11–1, *et seq.*, "may recover damages sounding in tort"). Because the events surrounding Mr. Shanholtz's discharge transpired before the Legislature had enacted W. Va.Code § 23–5A–1, we did not apply the statute to the facts of that case. Nevertheless, we recognized that W. Va.Code § 23–5A–1 "is a codification of what we perceive to be the law, that is, it is a contravention of public policy and actionable to discharge an employee because he filed a workmen's compensation claim against his employer." *Shanholtz*, 165 W.Va. at 312, 270 S.E.2d at 183 (citations omitted). Thus, the common law of the tort of retaliatory discharge and the remedies available thereunder are instructive to our determination of the appropriateness of the award of front pay damages in the case *sub judice*.

Historically, reinstatement was not a recognized remedy for the tort of retaliatory discharge. As we observed in *Harless II*,

> [t]he tort of retaliatory discharge was fashioned as an exception to the common law rule that an employer had an absolute right to discharge an at will employee.... This exception was drawn not to cover all at will firings but only those where it could be demonstrated that the discharge was in retaliation for the employee's exercising some substantial public policy right. The remedy afforded was not reinstatement but damages occasioned by the discharge.

*Harless v. First Nat'l Bank in Fairmont*, 169 W.Va. 673, 692, 289 S.E.2d 692, 703 (1982) (citations omitted).

> Notwithstanding the contrary common-law tradition, there has been widespread use of the reinstatement remedy in statutes prohibiting discrimination on the basis of sex, race, age, or handicap. It has even been said that reinstatement is the preferred remedy for the tort of retaliatory discharge, since no other remedy can fully compensate an employee for the wrongful loss of his or her job. In a retaliatory discharge action, reinstatement is an equitable remedy within the court's discretion[.]

82 Am.Jur.2d *Wrongful Discharge* § 230 (2003) (footnotes omitted). Thus, reinstate-

ment has evolved into an accepted remedy for the tort of retaliatory discharge. *See, e.g., Eddins v. Geneva Pharms., Inc.,* 877 F.Supp. 413, 421 (E.D.Tenn.1994) ("The Tennessee Supreme Court has clearly recognized the tort action of retaliatory discharge ... and has further held that the remedies of reinstatement and reimbursement for lost wages and work benefits are [among] the ... remedies available to the discharged employee."); *Skirpan v. United Air Lines, Inc.,* No. 83 C 0447, 1989 WL 84463, at *3 (N.D.Ill. July 21, 1989) (mem. op.) ("[W]e hold that reinstatement is a natural remedy for th[e] tort [of retaliatory discharge based upon workers' compensation discrimination] which was created to prevent wrongful discharge. No other remedy can fully compensate an employee for the wrongful loss of his or her job." (citation omitted)).

Similarly, this Court has repeatedly recognized that an employee who is wrongfully discharged may seek the remedy of reinstatement. *See, e.g.,* Syl., *Thompson,* 215 W.Va. 578, 600 S.E.2d 290 (including within list of remedies available to wrongfully discharged employee under Whistle–Blower Law, W. Va.Code § 6C–1–1, *et seq.,* "reinstatement of the employee"); Syl. pt. 3, *Bonnell v. Carr,* 170 W.Va. 493, 294 S.E.2d 910 (1982) ("The generally accepted rule is that where a tenured employee of a school system has been wrongfully discharged such employee is entitled to reinstatement."); *Martin v. Mullins,* 170 W.Va. 358, 362, 294 S.E.2d 161, 165 (1982) (commenting that, "[u]nder 42 *U.S.C.* 1983 an entirely good-faith violation of a civil right can result in the type of equitable relief that was awarded the wrongfully discharged ... employees-namely reinstatement with back pay"); Syl. pt. 2, *Hall v. Protan,* 158 W.Va. 276, 210 S.E.2d 475 (1974) (holding that wrongfully discharged deputy sheriff has right to be reinstated).

Not all cases, though, present the right circumstances for an employee's reinstatement. When the wrongful discharge is precipitated by or results in a hostile relationship between the employee and the employer, reinstatement is not appropriate. In such circumstances, we have recognized front pay as an acceptable substitute for reinstate-

ment. "[F]ront pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Pollard v. E.I. du Pont de Nemours & Co.,* 532 U.S. 843, 846, 121 S.Ct. 1946, 1948, 150 L.Ed.2d 62 (2001). *Accord Dotson v. Pfizer, Inc.,* 558 F.3d 284, 300 (4th Cir.2009) ("recogniz[ing front pay] as a proper form of relief that is 'an alternative and complement to reinstatement'" (quoting *Cline v. Wal–Mart Stores, Inc.,* 144 F.3d 294, 307 (4th Cir.1998))); *Thompson v. Town of Alderson,* 215 W.Va. at 579 n. 1, 600 S.E.2d at 291 n. 1 ("'"Front pay" is a shorthand term frequently used ... to refer to future lost pay and benefits.'" (quoting *Tadsen v. Praegitzer Indus., Inc.,* 324 Or. 465, 472 n. 5, 928 P.2d 980, 981 n. 5 (1996))). Stated otherwise, "[f]ront pay represents the difference between what an employee would have earned from his former employer had he not been fired and what he can expect to earn in any employment in the future." *Casteel v. Consolidation Coal Co.,* 181 W.Va. 501, 507 n. 8, 383 S.E.2d 305, 311 n. 8 (1989).

Therefore, "this Court [has] recognized that 'make-whole' relief could include an award by a jury of front pay in a wrongful discharge case, where reinstatement was not appropriate." *Thompson,* 215 W.Va. at 580, 600 S.E.2d at 292 (citation omitted). More specifically, we have observed that

"[t]he inclusion of equitable relief strengthens the conclusion that ... victims of ... discrimination ... be made whole by restoring them to the position they would have been in had the discrimination never occurred.

Front pay, an award for future earnings, is sometimes needed to achieve that purpose. Ordinarily, an employee would be made whole by a backpay award coupled with an order for reinstatement. Reinstatement is the preferred remedy to avoid future lost earnings, but reinstatement may not be feasible in all cases."

*Dobson v. Eastern Assoc. Coal Corp.,* 188 W.Va. at 24, 422 S.E.2d at 501 (quoting *Maxfield v. Sinclair Int'l,* 766 F.2d 788, 796 (3d Cir.1985)). Likewise, front pay is a suitable

substitute remedy for reinstatement when an employer objects to reinstatement: "A jury may award front pay in a Human Rights Act case where the employer, by opposing reinstatement, 'elected front pay rather than reinstatement.'" *Thompson,* 215 W.Va. at 580, 600 S.E.2d at 292 (quoting *Casteel v. Consolidation Coal Co.,* 181 W.Va. at 507, 383 S.E.2d at 311).

When determining whether a particular case lends itself to the remedy of reinstatement or whether an award of damages for front pay would be more appropriate, we have directed that "a court may rule preliminarily, that reinstatement is not a remedy that will be considered by the court." *Thompson v. Town of Alderson,* 215 W.Va. at 581, 600 S.E.2d at 293. Decisions regarding the issue of front pay rest within a circuit court's discretion. *See, e.g., Wilson v. Phoenix Specialty Mfg. Co., Inc.,* 513 F.3d 378, 388 (4th Cir.2008) ("Whether front pay is to be awarded is a matter left to the discretion of the trial judge." (citation omitted)); *Nichols v. Ashland Hosp. Corp.,* 251 F.3d 496, 504 (4th Cir.2001) ("The award of front pay rests squarely within the district court's discretion.").

In light of the foregoing authorities and the development of the law of retaliatory discharge in this State, we hold that an employee who asserts a claim alleging workers' compensation discrimination in accordance with W. Va.Code § 23–5A–1, *et seq.,* may recover damages for front pay in lieu of reinstatement. Whether the facts of a particular case warrant an award of front pay in lieu of reinstatement is a decision committed to the circuit court, and such a determination will be reviewed for an abuse of discretion.[18]

Applying this holding to the instant proceeding, we conclude that the circuit court did not abuse its discretion in determining that the facts of this case were not appropri-

ate for the consideration of reinstatement and, thus, that Mr. Peters could assert a claim for front pay damages. Given the level of distrust Rivers Edge had of Mr. Peters and the legitimacy of his workers' compensation claim,[19] it goes without saying that the atmosphere within which Mr. Peters would have been required to work had he been reinstated would hardly have been harmonious or collegial. Rather, the facts of this case lend themselves more to a complete severing of the employer-employee relationship such as would be accomplished through an award of front pay as opposed to forcing the continuation of the broken relationship through reinstatement. Accordingly, we affirm the circuit court's ruling permitting Mr. Peters to seek damages for front pay.

**2. The amount of front pay damages awarded by the jury is supported by the evidence.** Having concluded that front pay is an available remedy in this case, we next must determine whether the amount of Mr. Peters's front pay award is excessive. At the conclusion of the underlying trial, the jury returned a verdict in favor of Mr. Peters awarding him damages for, among other things, front pay in the amount of $513,410. With respect to the role of juries, we have held that "[i]t is the peculiar and exclusive province of a jury to weigh the evidence and to resolve questions of fact when the testimony of witnesses regarding them is conflicting and the finding of the jury upon such facts will not ordinarily be disturbed." Syl. pt. 2, *Skeen v. C & G Corp.,* 155 W.Va. 547, 185 S.E.2d 493 (1971). Therefore,

[i]n determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true.

---

**18.** This holding is consistent with the decisions of other jurisdictions considering whether an award of front pay is an available remedy in a case alleging workers' compensation discrimination. *See, e.g., Grillasca–Pietri v. Portorican American Broad. Co., Inc.,* 233 F.Supp.2d 258 (D.P.R.2002); *Breitenfeldt v. Long Prairie Packing Co., Inc.,* 48 F.Supp.2d 1170 (D.Minn.1999); *Ferry v. Cundiff Steel Erectors, Inc.,* 218 S.W.3d 390

(Ky.Ct.App.2006); *Sicklesmith v. Chester Hoist,* 169 Ohio App.3d 470, 863 N.E.2d 677 (2006); *Goodman v. Boeing Co.,* 75 Wash.App. 60, 877 P.2d 703 (1994), *aff'd,* 127 Wash.2d 401, 899 P.2d 1265 (1995).

**19.** *See* Sections III.D.1 and III.D.2, *infra.*

Syl. pt. 5, *Poe v. Pittman*, 150 W.Va. 179, 144 S.E.2d 671 (1965). *See also* Syl. pt. 5, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983) ("In determining whether there is sufficient evidence to support a jury verdict, the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved."). Moreover, "[c]ourts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption." Syl., *Addair v. Majestic Petroleum Co., Inc.*, 160 W.Va. 105, 232 S.E.2d 821 (1977).

▮▮▮▮ With specific respect to awards of front pay, we have counseled that "front pay damages, when appropriate, must be proved to a reasonable probability and are a form of compensatory damages, because they 'restore[ ] the terminated employee to the economic position that the employee would have enjoyed, were it not for the employer's conduct.'" *Thompson*, 215 W.Va. at 579 n. 1, 600 S.E.2d at 291 n. 1 (quoting *Tadsen*, 324

Or. at 470, 928 P.2d at 983). Nevertheless, in this State, juries, and not courts, typically resolve uncertainties inherent in calculations of front pay. *See Thompson*, 215 W.Va. at 581, 600 S.E.2d at 293 (discussing jury's calculation of front pay award); *Dobson*, 188 W.Va. at 23–25, 422 S.E.2d at 500–02 (upholding instruction directing jury to consider elements indicative of damages for front pay).[20]

Turning to the facts of the case *sub judice*, we conclude that the evidence supports the jury's assessment of the credibility of the witnesses and the evidence presented in support of the front pay damages that will be incurred by Mr. Peters. The amount of front pay awarded, *i.e.*, $513,410, was within the range of figures proffered by the experts as indicative of "the difference between what [Mr. Peters] would have earned from [Rivers Edge] had he not been fired and what he can expect to earn in any employment in the future." *Casteel v. Consolidation Coal Co.*, 181 W.Va. at 507 n. 8, 383 S.E.2d at 311 n. 8. Mr. Peters's evidence also presented calculations for lost future wages within the rubric of various hypothetical scenarios, which considered varying dates of separation from employment in light of Mr. Peters's age, retirement, and life expectancy. Evidence of this nature is consistent with the elements we

**20.** Although we note that our prior decision in *Thompson* places the determination of the amount of an award of front pay within the jury's consideration, there exists a split of authority on the subject. Some courts permit, like we have, the jury to determine the amount of front pay damages to be awarded. *See, e.g., Figgins v. Advance America Cash Advance Ctrs. of Michigan, Inc.*, 482 F.Supp.2d 861 (E.D.Mich.2007); *Cole v. Delaware Tech. & Cmty. Coll.*, 459 F.Supp.2d 296 (D.Del.2006); *Shesko v. City of Coatesville*, 324 F.Supp.2d 643 (E.D.Pa.2004); *Todaro v. County of Union*, 392 N.J.Super. 448, 920 A.2d 1243 (2007); *Sicklesmith v. Chester Hoist*, 169 Ohio App.3d 470, 863 N.E.2d 677 (2006); *Blaney v. International Ass'n of Machs. & Aerospace Workers, Dist. No. 160*, 151 Wash.2d 203, 87 P.3d 757 (Wash.2004). However, other jurisdictions have concluded that because awards of front pay provide equitable relief, the court should determine not only whether front pay is proper in a particular case but also the amount of front pay that should be awarded. *See, e.g., Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763 (7th Cir. 2006); *Johnson v. Spencer Press of Maine, Inc.*, 364 F.3d 368 (1st Cir.2004); *Cline v. Wal–Mart*

*Stores, Inc.*, 144 F.3d 294 (4th Cir.1998); *Harding v. Cianbro Corp.*, 498 F.Supp.2d 337 (D.Me. 2007); *Carpenter v. Tyler Indep. Sch. Dist.*, 429 F.Supp.2d 848 (E.D.Tex.2006), *aff'd*, 226 Fed. Appx. 400 (5th Cir.2007) (per curiam); *Brooks v. Lexington–Fayette Urban County Hous. Auth.*, 132 S.W.3d 790 (Ky.2004); *Brady v. Curators of Univ. of Missouri*, 213 S.W.3d 101 (Mo.Ct.App.2006). A third distinction has been made by courts that place the calculation of the amount of the front pay award within the province of the court, but permit the consideration of the jury's assessment of the evidence thereon. *Compare Watkins v. Input/Output, Inc.*, 531 F.Supp.2d 777, 780 (S.D.Tex.2007) (concluding that court should determine amount of front pay award but permitting court to "determine the amount of the award with the assistance of an advisory jury question") *with Broadnax v. City of New Haven*, 415 F.3d 265, 272 (2d Cir.2005) (describing jury's role as "non-advisory jury determination"). For a discussion of the differing views of the various United States Circuit Courts of Appeal, see generally *Bordeau v. Saginaw Control & Engineering, Inc.*, 477 F.Supp.2d 797 (E.D.Mich. 2007).

consider in calculating awards for lost future earnings in other cases. *See* Syl. pt. 2, in part, *Andrews v. Reynolds Mem'l Hosp., Inc.*, 201 W.Va. 624, 499 S.E.2d 846 (1997) (instructing that jury award for infant's lost future earnings will be upheld as not speculative "where the award of lost future earnings is within the range of estimated future earnings, based upon various life scenarios, reduced to present value, established by the expert testimony of an economist at trial" and where such evidence considers a "statistically ... average life expectancy and an average work life expectancy").

 Furthermore, to the extent that Rivers Edge complains that Mr. Peters failed to mitigate his damages, Rivers Edge's contention is without merit. When an employee is wrongfully discharged and the employer's actions in discharging said employee are malicious, the employee has no duty to mitigate his/her damages:

> *Unless a wrongful discharge is malicious*, the wrongfully discharged employee has a duty to mitigate damages by accepting similar employment to that contemplated by his or her contract if it is available in the local area, and the actual wages received, or the wages the employee could have received at comparable employment where it is locally available, will be deducted from any back pay award; however, the burden of raising the issue of mitigation is on the employer.

Syl. pt. 2, *Mason County Bd. of Educ. v. State Superintendent of Schs.*, 170 W.Va. 632, 295 S.E.2d 719 (1982) (emphasis added). As will be discussed in greater detail in Sections III.D.1 and III.D.2, *infra*, we find that Rivers Edge's malicious misconduct in terminating Mr. Peters's employment in retaliation for his application for and receipt of workers' compensation benefits absolves Mr. Peters of the duty to mitigate his damages in this case. Having thus determined the amount of Mr. Peters's front pay award to have been supported by the evidence, we affirm the circuit court's ruling upholding the jury's verdict in this regard.

### D. Punitive Damages

Lastly, Rivers Edge contends that the circuit court erred by upholding the jury's $1,000,000 award of punitive damages in this case. Rivers Edge additionally argues that the circuit court erred by approving the full amount of punitive damages awarded to Mr. Peters and by not reducing the amount of punitive damages awarded by the jury. Mr. Peters responds by stating that the circuit court correctly determined that punitive damages are proper in this case and also correctly upheld the amount of punitive damages awarded by the jury. By order entered June 29, 2007, the circuit court affirmed both the award of punitive damages and the amount thereof recommended by the jury.

 At the outset, we note that although we have addressed punitive damages in numerous prior cases, we have not definitively delineated the precise standard by which we review such awards. With regard to awards of punitive damages generally, we have held that,

> [u]pon petition, this Court will review all punitive damages awards. *In our review of the petition, we will consider the same factors that we require the jury and trial judge to consider,* and all petitions must address each and every factor set forth in Syllabus Points 3 and 4 of this case with particularity, summarizing the evidence presented to the jury on the subject or to the trial court at the post-judgment review stage. Assignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law.

Syl. pt. 5, *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991) (emphasis added). As to the amount of a punitive damages award, we have instructed that,

> [u]nder our punitive damage jurisprudence, it is imperative that the amount of the punitive damage award be reviewed in the first instance by the trial court by applying the model specified in Syllabus Points 3 and 4 of *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991), and Syllabus Point 15 of *TXO Production Corp. v. Alliance Resources Corp.*, 187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd*,

509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). *Thereafter, and upon petition, this Court will review the amount of the punitive damage award, applying the standard specified in Syllabus Point 5 of Garnes.*

Syl. pt. 5, *Alkire v. First Nat'l Bank of Parsons*, 197 W.Va. 122, 475 S.E.2d 122 (1996) (emphasis added). It is apparent from both of these holdings, then, that this Court accords a plenary or *de novo* review to jury awards of punitive damages and to circuit court rulings thereon because this Court considers the same factors that previously were considered by the jury and the trial court. *See* Syl. pt. 5, *Garnes*, 186 W.Va. 656, 413 S.E.2d 897. This conclusion is supported further by the similar observation of the United States Supreme Court in *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 436, 121 S.Ct. 1678, 1685–86, 149 L.Ed.2d 674 (2001), directing that "courts of appeals should apply a *de novo* standard of review when passing on district courts' determinations of the constitutionality of punitive damages awards." (Footnote omitted). Accordingly, we hold that, when reviewing an award of punitive damages in accordance with Syllabus point 5 of *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991), and Syllabus point 5 of *Alkire v. First National Bank of Parsons*, 197 W.Va. 122, 475 S.E.2d 122 (1996), this Court will review *de novo* the jury's award of punitive damages and the circuit court's ruling approving, rejecting, or reducing such award.

▬▬▬ In *Garnes*, we identified several factors that should be considered by a jury when deciding whether to award punitive damages to a plaintiff:

When the trial court instructs the jury on punitive damages, the court should, at a minimum, carefully explain the factors to be considered in awarding punitive damages. These factors are as follows:

(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater.

(2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.

(3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant.

(4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.

(5) The financial position of the defendant is relevant.

Syl. pt. 3, *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897.[21]

In direct reliance upon the holding in *Garnes*, this Court charged and instructed the jury as follows:

(i) Punitive or exemplary damages are intended to punish a Defendant, and that a plaintiff is not entitled to recover punitive damages as a matter of right. Punitive damages can be awarded only if you believe from

---

21. On appeal to this Court, the parties do not dispute that the circuit court correctly instructed the jury with respect to punitive damages. Within its punitive damages order of June 29, 2007, the circuit court restated its charge to the jury in this regard:

■■■■■ We also enumerated additional criteria a trial court should consider when evaluating the correctness of a jury's award of punitive damages:

When the trial court reviews an award of punitive damages, the court should, at a minimum, consider the factors given to the jury as well as the following additional factors:

(1) The costs of the litigation;

(2) Any criminal sanctions imposed on the defendant for his conduct;

(3) Any other civil actions against the same defendant, based on the same conduct; and

(4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff.

Because not all relevant information is available to the jury, it is likely that in some cases the jury will make an award that is reasonable on the facts as the jury

a preponderance of all of the evidence in this case that Defendant [Rivers Edge] acted willfully, wantonly, maliciously, or with criminal indifference toward its obligations in relationship to the employment of Plaintiff George Peters; and,

(ii) In order to recover punitive damages, Plaintiff George Peters must prove actual malice or wantonness on the part of Defendant or must prove such circumstances as warrant an inference of malice or wanton intention on the part of Defendant to wrong Plaintiff George Peters. The jury may award punitive damages only if they believe from a preponderance of the evidence that there has been such reckless and wanton disregard of Plaintiff's right as to show a malignant spirit on the part of Defendant; and,

(iii) The Court further instructs the jury that punitive damages, if awarded, must bear a reasonable relationship to the potential and actual harm caused. Punitive damages must also bear [sic] reasonable relationship to compensatory damages; and,

(iv) The Court instructs the jury that the mere existence of a discriminatory event, such as a termination on the basis of workers' compensation discrimination, does not automatically give rise to the recovery of punitive damages. Indeed, Plaintiff George Peters must establish by a preponderance of the evidence that Defendant engaged in further egregious conduct. In other words, Plaintiff George Peters must establish by a preponderance of the evidence that Defendant's conduct was wanton, willful or malicious to a degree that warrants damages above and beyond full compensation to him for all injuries he may have suffered as a result of Defendant's actions; and,

(v) Therefore, Plaintiff George Peters may only recover punitive damages if he prevails on his workers' compensation discrimination claim and if he proves by a preponderance of the evidence that Defendant did more than simply discharge him but also engaged in other egregious conduct; and,

(vi) You are instructed that in assessing the amount of punitive damages, you should take into consideration all of the circumstances surrounding the particular occurrence, including the nature of the wrongdoing, the extent of harm inflicted, the intent of the party committing the act, and the wealth of the perpetrator as well as any mitigating circumstances; and,

(vii) You are instructed that in assessing the amount of punitive damages, you are not allowed to use punitive damages as a way to punish Defendant for harm that may have been caused to any individual who is not [sic] party to the lawsuit. In other words, in determining an amount of punitive damages, you are not permitted to consider harm that may have been caused to an individual who is not [sic] party to this lawsuit; and,

(viii) If you find from the evidence in this case that the defendant is guilty of wanton, willful, or malicious conduct, or criminal indifference to the civil obligations affecting the rights of Plaintiff George Peters, you may award the plaintiff punitive damages in such sum as you believe sufficient to punish the defendant and to discourage such future conduct; and,

(ix) In awarding punitive damages you may consider the following factors in assessing the amount of punitive damages:

– You may consider whether defendant profited from its wrongful conduct, and if you find defendant did profit from its conduct you may remove the profit and your award should be in excess of the profit, so that the award discourages future bad acts by the defendant.

– As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.

– In determining the amount of punitive damages, the financial position of defendant is relevant; and,

(x) The Court instructs the jury that you may consider evidence of workers' compensation discrimination by defendants against persons other than George Peters in determining the reprehensibility of the defendants' conduct.

know them, but that will require downward adjustment by the trial court through remittitur because of factors that would be prejudicial to the defendant if admitted at trial, such as criminal sanctions imposed or similar lawsuits pending elsewhere against the defendant. However, at the option of the defendant, or in the sound discretion of the trial court, any of the above factors may also be presented to the jury.

Syl. pt. 4, *Garnes*, 186 W.Va. 656, 413 S.E.2d 897.[22]

However, at the most basic level, a review of an award of punitive damages involves two distinct inquiries: whether the case warrants an award of punitive damages and whether the amount of the punitive damages award is proper. We explained this procedure in Syllabus point 7 of *Alkire*:

> Our punitive damage jurisprudence includes a two-step paradigm: first, a determination of whether the conduct of an actor toward another person entitles that person to *a* punitive damage award under *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895); second, if a punitive damage award is justified, then a review is mandated to determine if *the* punitive damage award is excessive under *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991).

197 W.Va. 122, 475 S.E.2d 122 (emphasis in original). Applying these authorities to the facts of this case, we proceed to address each of these issues.

**1. Mr. Peters is entitled to an award of punitive damages.** Rivers Edge first argues that the evidence in this case was not sufficient to support the jury's award of punitive damages to Mr. Peters. In this regard, Rivers Edge claims that the evidence does not support an award of punitive damages against it because it has not acted "maliciously, wantonly, mischievously or with criminal indifference to civil obligations." Syl. pt. 3, in part, *Jopling v. Bluefield Water Works & Improvement Co.*, 70 W.Va. 670, 74

S.E. 943 (1912). Moreover, Rivers Edge asserts that punitive damages are not automatically available in a retaliatory discharge case; instead, "there must be evidence of misconduct by the defendant which is above and beyond the mere act of a retaliatory discharge." *Citing Harless v. First Nat'l Bank in Fairmont*, 169 W.Va. 673, 692 n. 19, 289 S.E.2d 692, 703 n. 19 (1982) (*Harless II*). Here, Rivers Edge asserts that Mr. Peters has not produced any evidence to indicate that Rivers Edge acted in any of the prohibited ways in discharging him from employment.

Mr. Peters replies that the circuit court considered the conduct of Rivers Edge and correctly upheld the jury's award of punitive damages. In demonstrating that Rivers Edge's conduct supports an award of punitive damages, Mr. Peters had to show only that Rivers Edge acted "wantonly, willfully, or maliciously." *Citing* Syl. pt. 4, *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895). Thus, Mr. Peters asserts that "the jury could reasonably conclude that Rivers Edge specifically disregarded the rights of George Peters and generally disregarded the rights of any employee who filed a workers compensation claim that the defendant [Rivers Edge] deemed to be 'suspicious'."

By order entered June 29, 2007, the circuit court reviewed and upheld the jury's award of punitive damages.[23] In its order, the lower court found that the evidence demonstrated that Rivers Edge had been "suspicious" of the validity of Mr. Peters's workers' compensation claim, that it placed him under surveillance when his doctor did not approve his return to work, and once his return to work had been approved, continued its surveillance of him rather than responding to his attempts to return to work. Moreover, the circuit court found further that, although Rivers Edge had known of Mr. Peters's ability to return to work for six days, the evidence adduced at trial demonstrated that Rivers Edge gave Mr. Peters only five hours'

---

22. The circuit court's findings upon its review of these *Garnes* factors will be discussed in Sections III.D.1 and III.D.2, *infra*.

23. We wish to commend the circuit court for the completeness of its punitive damages order, in which the court thoroughly addressed and considered the various cases comprising this Court's punitive damages jurisprudence.

notice that he was required to report to work on Wednesday, May 12, 2004. In its June 29, 2007, punitive damages order, the circuit court enumerated specific findings analyzing the *Garnes* factors:

the Court notes that the evidence at trial was sufficient for a jury to conclude that the Plaintiff [Mr. Peters] was severely harmed by the conduct of the Defendants [Rivers Edge], as the plaintiff lost his job, was placed under surveillance, and suffered economic losses; and,

[T]he Plaintiffs introduced the expert testimony of [William E. Cobb] [24] who opined to a reasonable degree of accounting certainty that the Plaintiff suffered economic damages ranging from $632,505.00 to $885,316.00 (Plaintiffs Trial Ex. 4), in response to which the Jury could reasonably determine that there was sufficient evidence to show that the Plaintiffs' damages was [sic] caused by River's [sic] Edge Mining's tortious misconduct; and,

[T]here was sufficient evidence from numerous witnesses, including Defendants [sic] own witnesses, for the jury to determine that Defendants, through the actions of their officers, employees or agents, committed the civil wrongs of unlawful failure to reinstate the plaintiff to his former position within their company, and that pursuit or receipt of workers' compensation benefits was a motivating factor of plaintiff's discharge (see Jury Verdict Form); [25] and

[T]his Court finds that the evidence at trial was clearly sufficient for a jury to properly conclude that Defendants continued in their damaging conduct for an extensive period of time; and,

[T]his Court finds that the Plaintiffs [sic] also adduced evidence from its own witnesses, together with the Defendants' witnesses, [from] which the jury could reasonably conclude that Defendants' conduct was reprehensible and self-serving. . . . Here, for example, the Plaintiffs [sic] adduced the following evidence before the

Jury, which was apparently sufficient for the Jury's determinations:

(a) In this case, the jury could reasonably conclude that Rivers Edge specifically disregarded the rights of George Peters and generally disregarded the rights of any employee who filed a workers compensation claim that the defendant deemed to be "suspicious;" and,

(b) The testimony in this case made clear that Rivers Edge and its agents were "suspicious" of the validity of Mr. Peters'[s] workers' compensation claim. In fact, the individuals involved in the decision to terminate Mr. Peters'[s] employment admitted that they were suspicious of his workers' compensation claim all the way up to the day of his termination. Yet, instead of allowing the workers['] compensation system to take its course, a reasonable jury could clearly conclude that Rivers Edge chose to take the law in its own hands; and,

(c) The evidence presented to the jury supports a finding that, when Mr. Peters'[s] doctor indicated he would be unable to return to work on April 28, 2004, Rivers Edge placed Mr. Peters' [sic] under surveillance the next day. When Mr. Peters'[s] doctor released him to return to work, the plaintiff began seeking to return to his employment with Rivers Edge. However, instead of immediately returning Mr. Peters to work, Rivers Edge continued its surveillance on the plaintiff and did not respond to the plaintiff's attempts to return to work; and,

(d) The evidence presented to the jury indicated that, when Donnie Pauley, the individual who ran the defendant's transitional work program, finally called Mr. Peters to come back to work, Mr. Pauley told Mr. Peters that it would be fine if the plaintiff returned to work the following day. However, Nancy Arritt (who admitted that she was suspicious of Mr.

---

24. In its order, the circuit court identified Amy Goins as Mr. Peters's expert witness. However, the trial transcript indicates that William E. Cobb, not Ms. Goins, testified on Mr. Peters's behalf.

25. See *supra* Section I for the relevant text of the jury's verdict form.

Peters'[s] workers' compensation claim) made Mr. Pauley call Mr. Peters back and inform the plaintiff that he had to appear for work that same day; and,

(e) The requirement imposed on the plaintiff by Ms. Arritt meant that, despite the fact that Rivers Edge had been on notice for six days that Mr. Peters could return to work, the defendant only gave Mr. Peters five hours notice that he was required to come to work. The jury could reasonably conclude that this illogical requirement imposed on the plaintiff by Rivers Edge was motivated by malice; and,

(f) When Mr. Peters showed up for work the next day, instead of putting him back to work, Rivers Edge terminated his employment. The jury clearly concluded that all of this conduct on the part of Rivers Edge was calculated and intentional. The facts and inferences in this case do not point so strongly and overwhelmingly in favor of Rivers Edge to lead to the conclusion that the jury was wrong in reaching this conclusion. In fact, the facts and inferences in this case point strongly in support of the jury's conclusion. Although the defendant had a duty under the law to return Mr. Peters to his employment following his absences related to a workers' compensation covered injury, Rivers Edge terminated Mr. Peters['s] employment on the day Mr. Peters showed up for work; and,

(g) Based on the evidence presented at trial, the jury could reasonably conclude that this was simply the way that Rivers Edge did business. As the testimony of Jerry Legg [another former Rivers Edge employee] demonstrated, the defendant had a plan for identifying persons it believed were committing workers' compensation fraud, placing those individuals under surveillance and taking action against such persons outside of the remedies available in the workers' compensation system; and,

(h) In this case there was ample evidence presented to prove that Rivers Edge terminated Mr. Peters'[s] employment in retaliation for filing a workers' compensation claim. In fact, that is what the jury decided. Further, the jury also found that the purported "legitimate" reason that the defendant proffered at trial to explain the termination was a pretext to cover its illegal retaliatory motive to terminate Mr. Peters for receiving or attempting to receive workers' compensation benefits. This illegal retaliatory motive was apparent at trial when representatives of Rivers Edge testified that they felt Mr. Peters was guilty of fraud and theft; and,

(i) It is also clear from the testimony at trial that Rivers Edge was well aware of the anti-retaliation provisions of the workers' compensation statutes. The jury could reasonably conclude that the defendant willfully, wantonly and maliciously disregarded Mr. Peters'[s] rights and retaliated against him for receiving or attempting to receive workers' compensation benefits.

[F]rom this evidence and all the other evidence adduced at trial, ... this Jury, it being a rational trier of fact, had sufficient evidence before it to conclude that River's [sic] Edge Mining's conduct was reprehensible ... and warranted the imposition of punitive damages[.]

 . . . .

[I]n regard to the other arguments regarding this Jury's award of punitive damages ... in this case, there was very substantial evidence from which a jury could properly find that River's [sic] Edge Mining's conduct was reprehensible and, specifically, that the plaintiff's pursuit or receipt of workers' compensation benefits was a substantial or motivating factor in his discharge from employment ... [.]

(Footnotes added). Based upon these findings, the circuit court found punitive damages to be proper in this case.

Pursuant to our holding in Syllabus point 7 of *Alkire*, our first punitive damages inquiry is "a determination of whether the conduct of the actor toward another person entitles that person to *a* punitive damage award under *Mayer v. Frobe*, 40 W.Va. 246,

22 S.E. 58 (1895)[.]" Syl. pt. 7, in part, *Alkire*, 197 W.Va. 122, 475 S.E.2d 122 (emphasis in original). *Mayer v. Frobe* instructs that, "[i]n actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous." Syl. pt. 4, 40 W.Va. 246, 22 S.E. 58. *Accord* Syl. pt. 1, *O'Brien v. Snodgrass*, 123 W.Va. 483, 16 S.E.2d 621 (1941) ("Punitive or exemplary damages are such as, in a proper case, a jury may allow against the defendant by way of punishment for wilfulness, wantonness, malice, or other like aggravation of his wrong to the plaintiff, over and above full compensation for all injuries directly or indirectly resulting from such wrong.").

 Nevertheless, "[t]o sustain a claim for punitive damages, the wrongful act must have been done maliciously, wantonly, mischievously, or with criminal indifference to civil obligations. A wrongful act, done under a *bona fide* claim of right, and without malice in any form, constitutes no basis for such damages." Syl. pt. 3, *Jopling v. Bluefield Water Works & Improvement Co.*, 70 W.Va. 670, 74 S.E. 943 (1912). Consistent with this recognition is our observation in *Harless v. First National Bank in Fairmont*, 169 W.Va. 673, 289 S.E.2d 692 (1982) (*Harless II*), to the effect that "[t]he mere existence of a retaliatory discharge will not automatically give rise to the right to punitive damages. The plaintiff must prove further egregious conduct on the part of the

employer." *Id.*, 169 W.Va. at 692–93, 289 S.E.2d at 703.

 Under the facts of this case, Mr. Peters has sustained his burden of proof. Not only did Mr. Peters adduce evidence to prove that his termination by Rivers Edge was in retaliation for his application for and receipt of workers' compensation benefits, Mr. Peters also proved that Rivers Edge's actions in this regard were malicious. "The foundation of an inference of malice is the general disregard of the rights of others, rather than an intent to injure a particular individual." *Addair v. Huffman*, 156 W.Va. 592, 603, 195 S.E.2d 739, 746 (1973).[26] Here, the evidence demonstrated that Rivers Edge had a "general disregard of the rights of others," *id.*, which was apparent from Rivers Edge's treatment of Mr. Peters throughout his receipt of statutory workers' compensation benefits for an injury he received while working for Rivers Edge.

As an employee of Rivers Edge, Mr. Peters had a right to apply for and receive workers' compensation benefits for any injury he incurred "in the course of and resulting from [his] covered employment." W. Va. Code § 23–4–1(a) (2003) (Repl. Vol. 2005).[27] Mr. Peters incurred such an injury at work, on October 28, 2003, when he broke his wrist. In spite of repeated medical treatment for this injury, Mr. Peters continued working, through the Transitional Work Program, until his doctor advised him, on March 1, 2004, that he needed to stop working until his wrist healed because it was not healing properly while he continued working. Mr. Peters heeded his physician's warnings, and requested and received temporary total disability benefits while he was off from work to

---

**26.** *See also Cline v. Joy Mfg. Co.*, 172 W.Va. 769, 772 n. 6, 310 S.E.2d 835, 838 n. 6 (1983) ("The usual meaning assigned to 'wilful,' 'wanton' or 'reckless' ... is that the actor has *intentionally* done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It usually is accompanied by a *conscious* indifference to the consequences, amounting almost to willingness that they shall follow; and it has been said that this is indispensable." (emphasis in original)); *Stone v. Rudolph*, 127 W.Va. 335, 345–46, 32 S.E.2d 742,

748 (1944) (defining "willful negligence" as "impl[ying] an act intentionally done in disregard of another's rights, or omission to do something to protect the rights of another after having had such notice of those rights as would put a prudent man on his guard to use ordinary care to avoid injury" (internal quotations and citation omitted)).

**27.** Since the occurrence of the events giving rise to the instant litigation, the Legislature has amended W. Va.Code § 23–4–1, although the quoted language remains unchanged. *See* W. Va.Code § 23–4–1(a) (2008) (Supp.2008).

permit his wrist to finally heal. During this time, Rivers Edge placed Mr. Peters under surveillance because it doubted the credibility of his workers' compensation claim. However, Mr. Peters's workers' compensation claim for his work-related wrist injury was determined to be legitimate and credible because he was granted an 11% permanent partial disability workers' compensation award for his injured wrist.

Thereafter, when Mr. Peters's doctor released him to return to work and he informed Rivers Edge of this fact, Rivers Edge did not immediately respond to his request that he be permitted to return to work through the Transitional Work Program. Neither did Rivers Edge timely contact Mr. Peters to inform him of his return to work date. Instead, Rivers Edge again placed Mr. Peters under surveillance.

The following week, Rivers Edge, by Mr. Pauley, attempted unsuccessfully to contact Mr. Peters but did not leave any messages to inform him of the date by which he was expected to return to work or to let him know that his request to return to the Transitional Work Program could be accommodated. When Mr. Pauley spoke with Mr. Peters on May 12, 2004, nearly one week after Mr. Peters's doctor had released him to return to work, Mr. Pauley informed Mr. Peters that he was required to report for work at his scheduled shift time later that same day. Mr. Peters responded that he could report to work the next day, but he was not prepared to report for his shift that same day, which was scheduled to start only five hours later. Finally, when Mr. Peters reported to work the day after he had spoken with Mr. Pauley, he was suspended and ultimately terminated.

Rivers Edge's conduct is particularly egregious in light of the fact the sole reason Mr. Peters was off from work, in the first instance, is because he had sustained a work-related injury while working for Rivers Edge. The actions of Rivers Edge show a

blatant "disregard" for the statutory workers' compensation rights accorded to Mr. Peters by the West Virginia Legislature: his right to recover benefits for his work-related injury, W. Va.Code § 23–4–1, and his right to retain his job during and after his convalescence for his work-related injury, W. Va. Code §§ 23–5A–1 and 23–5A–3(b). During the entire time Mr. Peters was off from work, Rivers Edge placed him under surveillance because it doubted the legitimacy of his workers' compensation claim. After Mr. Peters had been released by his doctor to return to work, Rivers Edge again placed him under surveillance and then delayed informing Mr. Peters as to when it expected him to return to work until, it claimed, he would risk violating the collective bargaining agreement's "two-day rule" if he did not report for his shift only a few short hours later.[28] This evidence is clearly demonstrative of the maliciousness of Rivers Edge's actions, not only in retaliating against Mr. Peters by firing him, but also in not respecting his right to apply for and receive workers' compensation benefits for an injury he received while he was working for Rivers Edge. Adding even more support for the award of punitive damages is the fact that there is no indication that Mr. Peters had a history of disciplinary problems while he was employed by Rivers Edge from November 2, 2002, until he was suspended on May 13, 2004. Thus, Mr. Peters's first instance of alleged misconduct as a Rivers Edge employee ultimately resulted in termination, again, all because he missed work because he was recovering from an injury he had sustained while performing Rivers Edge's work. We find that, upon this record, the jury was properly instructed and correctly awarded punitive damages to Mr. Peters. The circuit court also thoroughly reviewed the evidence adduced at trial in light of our punitive damages jurisprudence and properly upheld the jury's award of punitive damages. Accordingly, we affirm the circuit court's ruling in this regard.

28. That is not to say, however, that an employer may not use surveillance techniques to investigate the veracity of an injured employee's claim for workers' compensation benefits. In the case *sub judice*, though, we find that Rivers Edge's use of surveillance combined with all of the other facts and circumstances present in this case justified the jury's conclusion to award punitive damages to Mr. Peters.

**2. The amount of punitive damages awarded by the jury is not excessive.** Rivers Edge argues additionally that if this Court should determine that punitive damages are warranted in this case, such award should be substantially reduced. *Citing* Syl. pt. 6, *Alkire*, 197 W.Va. 122, 475 S.E.2d 122. In summary, Rivers Edge complains that the punitive damages awarded are not reasonably related to the harm actually sustained by Mr. Peters insofar as Rivers Edge disputes the amount of compensatory damages awarded by the jury. Additionally, Rivers Edge suggests that the 1:1 ratio of punitive to compensatory damages in this case might not be constitutionally permissible. *Citing Exxon Shipping Co. v. Baker*, —— U.S. ——, 128 S.Ct. 2605, 171 L.Ed.2d 570 (2008); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

Rivers Edge further contends that its conduct was not "reprehensible" as contemplated by *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 576, 116 S.Ct. 1589, 1599, 134 L.Ed.2d 809 (1996), because it simply discharged Mr. Peters based upon its belief that he had violated the "two-day rule" of the collective bargaining agreement. Moreover, Rivers Edge submits that it did not profit from its discharge of Mr. Peters, that its financial position was not accurately portrayed, and that it has expended substantial sums in the litigation of this case.

Mr. Peters responds by stating that the circuit court correctly upheld the amount of punitive damages awarded to him by the jury as such award is supported by the evidence introduced at trial. In this regard, Mr. Peters asserts that the punitive damages awarded in this case bear a reasonable relationship to the harm occasioned by Rivers Edge's conduct as well as to the compensatory damages awarded in this case; the jury awarded Mr. Peters punitive damages of $1,000,000 and compensatory damages of $885,089, for a ratio of punitive damages to compensatory damages of 1.13 to 1.

Mr. Peters additionally contends that the punitive damages awarded in this case represent Rivers Edge's reprehensible conduct. In support of his argument, Mr. Peters suggests that Rivers Edge regularly resorted to "self-help" methods when it believed an employee's workers' compensation claim was fraudulent and terminated employees such as Mr. Peters and Mr. Jerry Legg, who testified at trial. On this point, the circuit court properly instructed the jury that it could consider whether Rivers Edge had retaliated against other employees who had applied for or received workers' compensation benefits but that it could not punish Rivers Edge for harm caused to anyone other than Mr. Peters.

Mr. Peters also suggests that Rivers Edge's offers of settlement were neither fair nor prompt; no offer of settlement was made during the mandatory mediation ordered by the circuit court, and the only offer of settlement tendered by Rivers Edge was on the eve of trial in an amount equal to less than one-half of Mr. Peters's compensatory damages. Finally, Mr. Peters states that Rivers Edge misconstrues the cost of litigation factor; it is the cost of litigation to the plaintiff, not to the defendant.

In its punitive damages order of June 29, 2007, the circuit court also examined the amount of punitive damages awarded by the jury and upheld the jury's $1,000,000 punitive damages award, finding in pertinent part, that,

> from th[e] ... evidence adduced at trial, ... this Jury, it being a rational trier of fact, had sufficient evidence before it to conclude that River's [sic] Edge Mining's conduct was reprehensible ... and warranted the imposition of punitive damages in the amounts that such were assessed by the Jury for the conduct of the Defendants that had continued even after the initiation of this litigation; and,

> [W]hile the ratio of punitive damages to other damages may be supportive of a factor of 1, 3, 5 or possibly more, given the nature and extent of the evidence in a case, in this case the ratio of punitive damages to other damages (approximately 1:1) is well within the ratios considered reasonable by our Supreme Court of Appeals. The ratio of punitive damages to the compensatory and consequential damages

awarded to the Plaintiffs [sic] is approximately one to one; and,

[T]he Jury's award of punitive damages in this controversy, in their amount and in their extent, will help promote settlements in future matters of this type, especially where there is a disparity of bargaining power between the parties; and,

. . . .

In that the Defendants' conduct is unlawful in West Virginia, and that the award of punitive damages to the Plaintiffs [sic] is only a factor of one, the punitive damage award is obviously neither arbitrary, grossly excessive, nor in violation of the Defendants' due process rights ...; and,

. . . .

[F]ollowing the Court's recent inquiries into whether or not these West Virginia constitutional grounds have been utilized successfully by any defendant arguing against a jury award of punitive damages, the Court has been unable to ascertain any decision by our Supreme Court that has ruled in favor of any such defendant, when the trial court has properly charged the trial jury by the giving of an instruction of law based upon the enumerated factors set out in the *Garnes* case. This Court has determined as a matter of fact and law that it did so charge the Jury properly in regard to the articulated *Garnes* factors. Moreover, the Court believes from the Jury's deliberations and the verdict that it returned awarding a ratio of approximately 1:1 in punitive money damages, e.g. approximately $900,000 non-punitive damages juxtaposed to $1 Million in punitive damages, that the Jury properly applied its *Garnes* instructions to the relevant facts of this case[.]

On the basis of these findings and conclusions, the circuit court determined that the $1,000,000 punitive damages award was not excessive and upheld the jury's verdict awarding punitive damages in this amount:

[A]s a result of all of the findings and conclusions set forth above, the Court has expressly determined that it is just and reasonable, as well as equitable and necessary, to DENY the Defendants' Motion to Set Aside the Punitive Damages Award and to CONFIRM AND AFFIRM the Jury's Verdict which awarded $1,000,000 in punitive damages against the Defendants[.]

The second part of our two-step analysis of punitive damages awards directs us to consider whether the amount of a punitive damages award is excessive. Thus, we are mandated to conduct, once we have determined that "a punitive damage award is justified, ... a review ... to determine if *the* punitive damage award is excessive under *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991)." Syl. pt. 7, in part, *Alkire*, 197 W.Va. 122, 475 S.E.2d 122 (emphasis in original). Our inquiry into the reasonableness or excessiveness of a punitive damages award is guided by our holding in Syllabus point 6 of *Alkire*:

Every post-trial analysis as to the amount of the punitive damage award should be conducted by the trial court exclusively within the boundaries of Syllabus Points 3 and 4 of *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991), and Syllabus Point 15 of *TXO Production Corp. v. Alliance Resources Corp.*, 187 W.Va. 457, 419 S.E.2d 870 (1992)[, *aff'd*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)]. We remove from the lexicon of reviewing the amount of a punitive damage award the terms "really mean" and "really stupid," as they were applied in *TXO*.

197 W.Va. 122, 475 S.E.2d 122. Thus, in addition to the aforementioned factors enumerated in Syllabus points 3 and 4 of *Garnes*, 186 W.Va. 656, 413 S.E.2d 897, we must also consider our prior case of *TXO Production Corp. v. Alliance Resources Corp.*, in which we held, at Syllabus point 15, that

[t]he outer limit of the ratio of punitive damages to compensatory damages in cases in which the defendant has acted with extreme negligence or wanton disregard but with no actual intention to cause harm and in which compensatory damages are neither negligible nor very large is roughly 5 to 1. However, when the defendant has acted with actual evil intention,

much higher ratios are not per se unconstitutional.

187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).

The United States Supreme Court has identified coordinate considerations for a reviewing court to contemplate when assessing the correctness of the amount of a punitive damages award. In *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the Court identified three factors courts should consider when reviewing awards of punitive damages: (1) the reprehensibility of the defendant's conduct; (2) the ratio or relationship of punitive damages to compensatory damages; and (3) sanctions imposed for comparable misconduct. *See generally State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (applying *Gore* analysis).

The *Gore* Court first observed that "[p]erhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." 517 U.S. at 575, 116 S.Ct. at 1599, 134 L.Ed.2d 809 (footnote omitted). To this end,

> courts [were instructed to] determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell,* 538 U.S. at 419, 123 S.Ct. at 1521, 155 L.Ed.2d 585 (citing *Gore,* 517 U.S. at 576–77, 116 S.Ct. at 1589, 134 L.Ed.2d 809). Thus, "[i]t should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Campbell,* 538 U.S. at

419, 123 S.Ct. at 1521, 155 L.Ed.2d 585 (citing *Gore,* 517 U.S. at 575, 116 S.Ct. at 1599, 134 L.Ed.2d 809).

The *Gore* Court then continued its analysis, commenting that "[t]he second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff." *Id.,* 517 U.S. at 580, 116 S.Ct. at 1601, 134 L.Ed.2d 809 (citation omitted). *See also Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 18, 111 S.Ct. 1032, 1043, 113 L.Ed.2d 1 (1991) ("We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case. We can say, however, that general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus."). In other words, "exemplary damages must bear a 'reasonable relationship' to compensatory damages[.]" *Gore,* 517 U.S. at 580, 116 S.Ct. at 1601, 134 L.Ed.2d 809. In this regard, "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the ... goals of deterrence and retribution ...[,]" *Campbell,* 538 U.S. at 425, 123 S.Ct. at 1524, 155 L.Ed.2d 585 (citation omitted), but "[t]he precise award in any case ... must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff," *id.* *But see Exxon Shipping Co. v. Baker,* ⸺ U.S. ⸺, ⸺, 128 S.Ct. 2605, 2633, 171 L.Ed.2d 570 (2008) (concluding that a punitive to compensatory damages ratio of "1:1 ... is a fair upper limit in ... *maritime* cases" (emphasis added)).

Lastly, the *Gore* Court recognized that "[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct provides a third indicium of excessiveness." *Gore,* 517 U.S. at 583, 116 S.Ct. at 1603, 134 L.Ed.2d 809. Thus, "a reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.' " *Id.* (quoting *Brown-*

*ing–Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 301, 109 S.Ct. 2909, 2934, 106 L.Ed.2d 219 (1989) (O'Connor, J., concurring, in part, and dissenting, in part)).

Applying these authorities to the facts of the case *sub judice,* we are convinced that the jury's award of $1,000,000 in punitive damages was not excessive, and the circuit court did not err in upholding this award. As we observed in the preceding section, Rivers Edge's conduct was sufficiently reprehensible to warrant punitive damages in this amount. Among other things, the evidence adduced at trial showed that Rivers Edge was indifferent to Mr. Peters's health and safety by doubting the credibility of his workers' compensation claim, placing him under surveillance, and terminating him for having missed work as a result of his work-related injury. Rivers Edge's misconduct continued for a period of time and was not a single, isolated incident. Moreover, Rivers Edge's actions were malicious. In short, Rivers Edge's conduct "is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Campbell,* 538 U.S. at 419, 123 S.Ct. at 1521, 155 L.Ed.2d 585 (citation omitted).

██ Furthermore, the amount of punitive damages awarded in this case is not so excessive as to "raise a suspicious judicial eyebrow." *TXO Prod. Corp. v. Alliance Res. Corp.,* 509 U.S. 443, 481, 113 S.Ct. 2711, 2732, 125 L.Ed.2d 366 (1993) (O'Connor, J., dissenting). In Syllabus point 15 of *TXO,* we held that

[t]he outer limit of the ratio of punitive damages to compensatory damages in cases in which the defendant has acted with extreme negligence or wanton disregard but with no actual intention to cause harm and in which compensatory damages are neither negligible nor very large is roughly 5 to 1. However, when the defendant has acted with actual evil intention, much higher ratios are not per se unconstitutional.

187 W.Va. 457, 419 S.E.2d 870. Here, the jury awarded Mr. Peters punitive damages in the amount of $1,000,000 and compensatory damages in the amount of $885,107. Thus, the actual ratio of punitive damages to compensatory damages in this case is 1.13 to 1, or approximately 1:1. This ratio is not excessive and is well within the constitutionally permissible limits for punitive damages awards.

Finally, there are no comparable criminal or civil penalties to punish employers who wrongfully terminate employees who have applied for or received workers' compensation benefits. *See Vandevender v. Sheetz, Inc.,* 200 W.Va. 591, 605, 490 S.E.2d 678, 692 (1997) (per curiam) ("[T]he trial court correctly concluded that it was without civil or criminal penalties for comparison purposes."). The governing statutory law simply does not provide for such penalties. *See* W. Va.Code § 23–5A–1, *et seq.* Therefore, the imposition of a punitive damages award is a proper method by which to punish Rivers Edge for its misconduct in wrongfully terminating Mr. Peters. *Cf. Boyd v. Goffoli,* 216 W.Va. 552, 608 S.E.2d 169 (2004) (upholding punitive damages award in amount greater than authorized civil penalties for same misconduct).

Having therefore determined that the jury was properly instructed and that the circuit court correctly upheld the jury's verdict awarding Mr. Peters punitive damages of $1,000,000, we affirm the circuit court's ruling upholding the punitive damages awarded in this case.

## IV.

## CONCLUSION

For the foregoing reasons, the October 17, 2007, order of the Circuit Court of Boone County is hereby affirmed.

Affirmed.